**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUDITH MILLS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. |
| SOUTHERN CONNECTICUT STATE | : | 3:08-cv-1270 (VLB) |
| UNIVERSITY, SAMUAL ANDOH AND | : | |
| YILMA GEBREMARIAM, | : | |
| Defendants. | : | August 10, 2011 |

<u>MEMORANDUM OF DECISION GRANTING DEFENDANTS'</u>
<u>MOTION FOR SUMMARY JUDGMENT [Doc. #58]</u>

The plaintiff, Judith Mills ("Mills"), a professor at Southern Connecticut State University ("SCSU"), filed this action against SCSU and her fellow professors Samuel Andoh ("Andoh") and Yilma Gebremariam ("Gebremariam") (collectively, the "Defendants"). Mills asserts a claim against SCSU under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq. (Count One). She also asserts claims against Andoh and Gebremariam for violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq. (Counts Two and Three), intentional infliction of emotional distress (Counts Four and Five), and violation of the Equal Protection Clause as enforced by 42 U.S.C. § 1983 (Counts Six and Seven).

Presently pending before the Court is the Defendants' motion for summary judgment on all counts.  [Doc. #58].[1]  For the reasons stated below, the Defendants' motion is GRANTED.

## I. FACTUAL BACKGROUND

Mills is a female professor of Economics at SCSU, where she has been teaching since August 1992.  Defendants' Local Rule 56(a)(1) Statement [Doc. #58-3] (hereinafter Def. 56(a)(1) Statement) ¶ 2.  Andoh is currently a professor in the Department of Economics and Finance (the "Department") at SCSU and has been teaching there since 1987.  *Id.* ¶ 1.  Andoh was the Chairperson of the Department from January 1996 to August 2009.  *Id.* ¶ 12.  In this capacity, Andoh's duties included, among other things, evaluating faculty renewal, tenure and promotion.  *Id.* ¶ 13.  Andoh was not ultimately responsible for disciplining or promoting faculty, but could only make recommendations to the Dean.  *Id.* ¶ 14.  Gebremariam is currently a professor in the Department at SCSU and has been teaching there since August 1990.  *Id.* ¶ 3.  Gebremariam was not responsible for supervising any faculty at SCSU.  *Id.* ¶ 17.

Mills alleges that she was sexually harassed by Gebremariam and subjected to discrimination based upon her gender by Andoh, Gebremariam and Adam Abugri ("Abugri"), another male faculty member in the Department.  Plaintiff's Local Rule 56(a)(2) Statement [Doc. #74] ¶ 20.  The harassment and

---

[1]  SCSU and Gebremariam filed their motion for summary judgment on September 10, 2010.  [Doc. #58].  On September 27, 2010, Andoh moved for permission to join in or adopt the legal arguments contained in the memorandum of law in support of the motion for summary judgment filed by SCSU and Gebremariam.  [Doc. #61].  The Court granted Andoh's motion on October 4, 2010. [Doc. #66].

discrimination by these individuals which gives rise to this lawsuit allegedly began in 2004. Deposition of Judith Mills [Doc. ##58-7, 72, 73, 84-1, 85-4] (hereinafter "Mills Depo.") at 14. Specifically, on or about October 15, 2004, Gebremariam was asked to compose a paragraph for an advertisement for SCSU Interim President Philip Smith's retirement brochure, and he sought the assistance of Mills. Def. 56(a)(1) Statement ¶ 32. Gebremariam claims that Mills was very helpful and, out of gratitude, he attempted to hug her. *Id.* ¶ 33. Mills stopped him from hugging her and told him it was inappropriate, at which point Gebremariam pulled back. *Id.* ¶ 33. Mills objects to the characterization of the incident as an "attempted" hug, claiming that Gebremariam actually hugged her in such a manner that he was "plastered to [her] front" and that she "pushed him away." Mills Depo. at 57-58.

Mills reported this incident to Gary Crakes ("Crakes"), another professor in the Department. Def. 56(a)(1) Statement ¶ 34. Crakes in turn reported the incident to Andoh, who told Gebremariam that the hug was inappropriate and that he was to apologize to Mills. *Id.* ¶ 35. The Defendants claim that Gebremariam placed a call to Mills that day to apologize and that Mills accepted the apology. *Id.* ¶ 36. Gebremariam then followed up with Andoh and told him that he apologized to Mills, and Andoh believed the issue was resolved. *Id.* ¶ 37. Mills admits that she received a call from Gebremariam apologizing about the incident, but testified that she believed him to be sorry that she was unhappy about it, not sorry that he had made inappropriate contact with her. Mills Depo. at 59.

Subsequently, on November 19, 2004, Mills went to Andoh's office to see what he had done about the hug incident and to ask if he kept a "secret" personnel file on her. Def. 56(a)(1) Statement ¶ 38. After the meeting, Mills wrote a written complaint about the hug incident and gave it to Andoh. *Id.* ¶ 39. Andoh then reported the incident to the Office of Diversity and Equality ("ODE"). *Id.* ¶ 39. The ODE conducted an investigation and issued a report concluding that Gebremariam did not sexually harass Mills and that the issue was resolved and handled appropriately by Andoh. *Id.* ¶ 42. Other than this instance, Gebremariam never touched Mills nor did he ever make any comments to her of a sexual nature. Mills Depo. at 60-61. Mills further admits that Gebremariam never used vulgar language or any sexual profanity in her presence. *Id.* at 73-74. She claims, however, that Gebremariam made comments to her that she interpreted as suggesting that she or other women were not following "the appropriate gender role." *Id.* at 60-61. Specifically, Mills recounted a conversation in which Gebremariam asked her why she was working with small children when her children were considerably older. *Id.*

In December 2004, Debra Savage ("Savage"), a female professor in the Department, accused Gebremariam of being a woman basher and sent an email to the Dean of SCSU in which she repeated her accusations against Gebremariam. Def. 56(a)(1) Statement ¶¶ 46-47. The Defendants claim that, because of these incidents, Gebremariam feared that no matter what he said or did Mills and Savage would assert claims of harassment or threaten to sue him. *Id.* ¶ 48. As a result, on September 29, 2005, Gebremariam resigned from the

Department Evaluation Committee ("DEC"), which is an internal Department body that evaluates faculty members for promotion, because he felt that could not objectively evaluate Mills or Savage for promotion in light of their claims against him. *Id.* ¶ 49. Two other male faculty members also resigned from the DEC because of emails from Savage that were accusatory in nature. *Id.* ¶ 49. Subsequently, at a faculty meeting for the School of Business on October 10, 2005, Gebremariam spoke about what he described as unprofessional accusations against him and his wife; he did not mention anyone by name. *Id.* ¶¶ 50-51. After the meeting, Mills and Savage filed a complaint accusing Gebremariam of verbally attacking them in the meeting. *Id.* ¶ 52. The DCE investigated the claim and concluded that Mills and Savage were not discriminated against on the basis of gender during the meeting and that there was no indication that threatening or harmful language had been expressed. *Id.* ¶ 53.

After this incident, Gebremariam resigned from all departmental faculty committees that included Mills and Savage. *Id.* ¶ 56. Mills claims that after the incident, Gebremariam and other male faculty members shunned her. Mills Depo. at 74-75. She also claims that she was excluded from discussions among faculty members, and that it got to the point that no male faculty members would engage in conversation with her other than in passing. *Id.* at 75-76.

In regard to Andoh, Mills admits that he never made any sexually explicit remarks, comments about her looks, sexual jokes, nor did he ridicule her in front of others. *Id.* at 101, 103-04. Mills contends that Andoh "supported"

Gebremariam's harassment of her by failing to properly respond to the hug incident. *Id.* at 24-25. She testified, however, that she did not report the incident directly to Andoh, that she did not known when Crakes, who she had informed of the incident, reported it to Andoh, and that she did not know whether Andoh spoke with Gebremariam or what he said to Gebremariam. *Id.* at 84-85. Mills also alleges that Andoh exhibited hostile behavior toward her. Specifically, she claims that when she went to speak with Andoh about the hug incident in November 2004, he became angry and dropped his books and slapped his desk, which frightened her. *Id.* at 85-89. Mills claims that during another meeting in January 2005, Andoh "stomped out of his office and slammed the door," which caused her to become terrified that he "might strike or hit her." *Id.* at 270-74. Andoh denies this, claiming that he never exhibited angry or violent behavior toward Mills and always acted professionally. Def. 56(a)(1) Statement ¶ 66. Mills further claims that Andoh was among the group of male faculty members who shunned her. Mills Depo. at 105.

In addition, Mills claims that Abugri harassed her because he "looms." Mills Depo. at 26-27. She explained that when Abugri disagreed with her at faculty meetings he would sometimes "get in her face, maybe a foot away." *Id.* If he was seated several seats away, he would sometimes "lean over the table" toward Mills when he disagreed with her. *Id.* at 28-29. Mills further claims that Abugri was dismissive of her and shunned her after she made complaints about other male faculty members in the Department. *Id.* at 33-35. In 2008-2009, Abugri sent emails to Mills about a dispute involving the selection of a Department

Chairperson that she claim were threatening in their tone. *Id.* at 37-38. For instance, in one particular email that Mills claims was threatening, Abugri stated, in relevant part:

> Following section II.D.9 of the Senate Document on the Chair's selection the DPC of Economics and Finance (Drs. Mills, Savage and Grubacic) is recalled by a majority of members in the department . . . On that basis, the committee is still recalled. If there are any hidden justifications, then let the department and the entire faculty on campus know of those justifications and to who they are to be submitted. That will require an amendment to the Senate document on Chairs Selection. In the Dean's memo below which Dr. Mills prefers to call instructions, instructions?, majority of us in the department are not aware of any discussions leading to this memo. If that is a new standard procedure of the Senate and the Provost outside the chairs document, then all departments and faculty on campus must be informed. It is our collective right to have a hearing on any subject that affects us and on which "conclusions" are drawn about.

Def. Exh. 9 [Doc. #58-9] at 54-55. Mills admits that Abugri never touched her or made any sexual remark toward her. Mills Depo. at 31.

Mills claims that, after complaining of harassment and discrimination by male faculty members, she was retaliated against by being denied a promotion to a tenured faculty position. The evaluation process for promotion to a tenured faculty position at SCSU occurs in several steps. The process begins with submission of an application to the DEC, which is comprised of tenured faculty members chosen from within the candidate's Department and which must be comprised of at least three people. Def. 56(a)(1) Statement ¶¶ 90-92. After that the application is evaluated by the Chairperson of the Department. *Id.* The application is then considered by the Dean of the School. *Id.* ¶ 93. The next step is evaluation by the University Promotion and Tenure Committee (the "P&T

Committee"), which is comprised of fifteen elected faculty members. *Id.* ¶ 94. As a candidate's application moves through the process, each body must review the file and evaluate the candidate's qualifications for promotion in the categories of teaching or professional competence, creative activity, productive service to the department, professional attendance and participation, and years in rank. *Id.* ¶ 96. Each body then renders an evaluation on a scale ranging from "do not recommend" to "very strongly recommend." *Id.* ¶ 97. After all the reviews are completed, the candidate's file is then sent to the President, who makes the final decision on the promotion. *Id.* ¶ 99.

In 2005, Mills was being considered for promotion. Savage was also being considered for promotion in 2005. The three members of the DEC at the time were Gebremariam, Crakes, and Robert Eldridge. *Id.* ¶ 101. As noted previously, all three members resigned from the DEC because they did not believe they could review the applications for promotion submitted by Mills and Savage in an unbiased manner due to accusations that had been leveled against them by the applicants. *Id.* Also in 2005, Andoh requested that the President recuse him from evaluating Mills, citing fear that she would take action against him if he gave her anything short of an exemplary evaluation. *Id.* ¶ 102. Andoh claims that he played no role in the DEC members' resignations. *Id.* ¶ 104. The resignations effectively disbanded the DEC because only two other faculty members were eligible to sit on the DEC at the time. *Id.* Upon learning about the resignations of the DEC members, Andoh took steps to issue a "hardship DEC" but his request was denied by the President. *Id.* ¶¶ 105-106. Mills filed a contractual grievance

and the remedy for that grievance provided that she could reapply for promotion the following year and if granted, it would apply retroactively. *Id.* ¶ 106.

Mills reapplied for promotion in 2006, and was evaluated by the DEC, Dean, and P&T Committee. *Id.* ¶ 107. The three members of the DEC in 2006 were Peter Bodo, Mehdi Mostaghimi, and James Thorson. Def. Exh. 20 [Doc. #58-12]. Andoh declined to write an evaluation letter. *Id.* The DEC and Dean recommended Mills for promotion, but the P&T Committee did not. Def. 56(a)(1) Statement ¶ 107. Mills does not know what criteria the P&T Committee used to make its decision. Mills Depo. at 149-50. SCSU's President ultimately decided not to promote Mills. Def. 56(a)(1) Statement ¶ 109. Gebremariam was on the P&T Committee in 2006-2007 but recused himself from reviewing Mills' application for promotion and claimed that he did so in order to avoid accusations that he negatively impacted the committee's decision regarding Mills. *Id.* ¶ 95. Mills does not know the reason her promotion was denied by the President. Mills Depo. at 110.

In addition to the denial of promotion, Mills also complains that she was discriminated and retaliated against in various other ways. She contends that Andoh, who was responsible for preparing teaching schedules for the Department, denied her requests to teacher upper level courses and refused to accommodate the schedule she asked for. *Id.* at 93-95. She further claims that Andoh was slower in responding to her than he was in responding to male faculty members, and that he often said that she was wrong about a point while agreeing with male faculty members who said the same thing. *Id.* at 101-02. In addition, she claims that male faculty members "boycotted" graduation and Economics

Society events that she hosted, and that students were discouraged from participating in these events.  *Id.* at 151-52.  She also claims that students have told her that they were worried that they would have trouble getting recommendations if they associated with her outside of class.  *Id.*  However, she did not identify any particular student who was discouraged from participating in events she hosted or who were refused a recommendation for associating with her.  *Id.*  Finally, she contends that she was labeled a "troublemaker" outside of the Department, which made it difficult for her to deal with other deans or get elected to University committees or participate in other career-enhancing activities.  *Id.* at 129-30, 143-46.  Mills testified, however, that since 2006 she has served on numerous University committees and was elected as the faculty Senate representative from her Department.  *Id.* at 198-99.

## II. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).  "The moving party bears the burden of showing that he or she is entitled to summary judgment."

*Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

### III. DISCUSSION

#### A. Title VII Claim Against SCSU

In Count One, Mills alleges that SCSU violated Title VII by discriminating against her on the basis of her gender, creating a sexually hostile work environment, and retaliating against her when she complained of gender-based discrimination and harassment by male faculty members. The Court will address each claim in turn.

#### 1. Gender-Based Discrimination

Title VII prohibits an employer from discriminating against an employee because of the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* standard requires that a plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse

11

employment action; and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination.  *See Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000).  The Second Circuit has noted that the burden of establishing a *prima facie* case is "minimal" or "de minimis." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell*, 411 U.S. at 802.  As this stage, the defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision.  *See Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citation and internal quotation marks omitted).

If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination.  *McDonnell*, 411 U.S. at 804.  "Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143 (citation and internal quotation marks omitted).

Here, it is undisputed that Mills is a female and therefore a member of a protected class.  It is also undisputed that Mills was qualified for her position as a

professor of Economics.  Therefore, the Court's analysis focuses on the third and fourth elements of the *prima facie* case.

An adverse employment for purposes of a discrimination claim is a "materially adverse change in the terms and conditions of employment" that must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted).  Termination, demotion evidenced by a decrease in earnings, a less distinguished title, a material loss of benefits, significantly decreased material responsibilities, or other indicators unique to a particular employment context may constitute an adverse employment action.  *Id.*  "Not every action that is perceived negatively by an employee is a materially adverse change in the terms and conditions of employment."  *Klein v. New York Univ.*, - F. Supp. 2d - , 2011 WL 2020880, at *7 (S.D.N.Y. Apr. 1, 2011).  Mills asserts a number of actions by faculty members at SCSU that she claims were materially adverse.

### a. Failure to Promote

First, Mills claims that she was denied a promotion to a tenured faculty position based upon her gender in 2005-2006 and 2006-2007.  A failure to promote is an adverse employment action.  *See Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).  However, Mills has failed to present sufficient evidence to demonstrate that she was denied a promotion in circumstances giving rise to an inference of discrimination.

The evaluation process for promotion to a tenured faculty position at SCSU occurs in several steps.  Review of a candidate's application by the DEC is the

first step in the process.  The candidate's application materials then go to the Department Chairperson, Dean, and P&T Committee for evaluation, in that order. The President makes the final decision on the promotion.

Mills first submitted her application for promotion in 2005.  Savage also applied for promotion in 2005.  However, all three members of the DEC resigned because they did not believe they could impartially evaluate the applications due to the fact that Mills and Savage had leveled accusations of discrimination and harassment against each of them.  As a result, the DEC was effectively disbanded, and the evaluation process never occurred in 2005.  Mills grieved the denial of her promotion for the 2005-2006 year.  SCSU resolved the grievance by agreeing that if Mills applied for and was promoted in 2006-2007, the promotion would be retroactive to 2005.

Mills reapplied for promotion in 2006.  The promotion process was conducted at all levels through a final decision by the President.  Both the DEC and Dean recommended Mills for promotion.  However, the P&T Committee did not recommend her for promotion, and the President decided not to promote her.

Mills claims that she was denied a promotion due to her gender.  However, she has submitted no evidence to support this assertion.  She does not present any evidence to show that males were disproportionately promoted, or that SCSU used different criteria in evaluating male applicants for promotion than they used in evaluating her or females in general.  She does not point to any degrading remarks made by anyone at SCSU about her.  Instead, Mills speculates that Andoh and Gebremariam influenced the promotion decision.  However, the

evidence in the record does not support this claim.  In 2005, Gebremariam resigned from the DEC because he did not believe he could fairly evaluation Mills for promotion in light of the accusations of harassment she had leveled at him.  The other members of the DEC resigned as well due to similar accusations that had been leveled against them by Mills and Savage.  Andoh requested a hardship DEC on behalf of Mills, but the President denied his request.  As a result, Mills' evaluation was conducted the following year by a different DEC.  Gebremariam was not on that DEC.  In 2006, the DEC and Dean both recommended Mills for promotion.  Andoh did not submit an evaluation because he feared that Mills would take action against him if he gave her anything short of an exemplary evaluation.  The P&T Committee decided not to recommend Mills for promotion.  Gebremariam was on the P&T Committee in 2006, but recused himself from reviewing Mills' application.  The President ultimately denied Mills' application for promotion.  Thus, the evidence indicates that, contrary to Mills' unsupported allegation, Gebremariam and Andoh played no role in her evaluation for promotion.  Mills presents no information to suggest that the P&T Committee or the President denied her application because of gender bias.

Furthermore, even if Andoh and Gebremariam did exert influence on the P&T Committee and caused her promotion to be denied, Mills has not produced sufficient evidence to demonstrate that they did so because of her gender.  Mills claims that, in October 2004, Gebremariam hugged her.  Apart from the hug, she admits that Gebremariam never touched her or made any sexual remarks to her.  She claims that Gebremariam made comments that she interpreted as suggesting

that she or other women were not following "the appropriate gender roles." Mills Depo. at 60-61. However, the only specific conversation she recounted was one in which Gebremariam asked her why she was working with small children when her children were considerably older. *Id.* No reasonable juror could interpret this fairly innocuous statement to be indicative of gender bias. Mills also complains that Gebremariam verbally attacked her during a faculty meeting in October 2005, which she interprets as gender discrimination. During the meeting, faculty members discussed problems with the Business School, including the negative interpersonal atmosphere. Gebremariam Aff., Def. Exh. 2 [Doc. #58-6] ¶ 25. Gebremariam spoke in general terms about what he described as unprofessional accusations against him and his wife. *Id.* He did not single out Mills or mention anyone by name. Again, no reasonable juror could find Gebremariam's general statements about accusations that had been leveled against him which he believed to be unfair and unprofessional to constitute gender bias on his part.

In regard to Andoh, Mills admits that he never made any sexually explicit remarks, comments about her looks, sexual jokes, nor did he ridicule her in front of others. Mills Depo. at 101, 103-04. She claims, however, that Andoh "supported" Gebremariam's alleged harassment of her. Although it is not entirely clear what she means by this, it appears that Mills is claiming that Andoh did not properly respond to her complaint about the hug incident. However, Mills does not explain how Andoh's response was deficient, and based upon the evidence in the record it seems to have been entirely appropriate. After the hug incident occurred, Mills reported it to Crakes, not to Andoh directly. When

Crakes informed Andoh of the incident, Andoh spoke with Gebremariam and told him that the hug was inappropriate and that he was to apologize to Mills. Mills admits that Gebremariam did call her to apologize, although she questions the sincerity of his apology. *Id.* at 59. At this point, Andoh believed the issue to have been resolved. However, approximately one month later, Mills went to Andoh's office to ask what he had done about the hug incident. After the meeting, Mills provided a written complaint to Andoh and Andoh reported the hug incident to ODE, which conducted an investigation and concluded that Gebremariam did not sexually harass Mills and that the issue was resolved and handled appropriately by Andoh. Contrary to Mills' conclusory assertions, no reasonable juror could conclude that Andoh's response to this incident reflects gender bias.

Mills also claims that Andoh, Gebremariam, and other male faculty members "shunned" her. But there is no evidence that the shunning, if it did occur, was based upon her gender. Instead, the evidence in the record suggests that Andoh and Gebremariam avoided Mills because she repeatedly accused them of harassment and discrimination and they feared that she would do so again regardless of what they said or did. Mills also claims that Andoh became angry during meetings with her. In one instance, he allegedly dropped his books and slapped his desk. Mills Depo. at 85-89. During another meeting, he allegedly "stomped out of his office and slammed the door." *Id.* at 270-74. However, Mills provides no evidence that Andoh's frustration with her had anything to do with her gender.

In summary, the only evidence that Mills submits to support her allegation that Andoh and Gebremariam discriminated against her because of her gender is her deposition testimony containing her own unsubstantiated and conclusory beliefs.  This is insufficient to create a genuine issue of material fact for trial.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").  Furthermore, there is no evidence that Andoh or Gebremariam played any role in SCSU's decision not to promote her to a tenured faculty position.  Nor is there any evidence that the P&T Committee, which recommended that her application for promotion be denied, or the President, who ultimately denied her promotion, harbored gender bias.  Accordingly, Mills cannot sustain a gender discrimination claim based upon her failure to be promoted.

### b. Course Assignments

Next, Mills contends that Andoh denied her requests to be assigned to teach upper level classes and refused to accommodate the schedule she wanted. "A university professor's dissatisfaction with course assignments when he or she 'does not allege any resulting loss in wages' is not an adverse employment action." *Klein*, 2011 WL 2020880, at *10 (quoting *Boise v. Boufford*, 121 Fed. Appx. 890, 892-92 (2d Cir. 2005)).  Mills has not offered any evidence that the courses she was assigned impacted her compensation or other material benefits. Therefore, her course assignments and schedule do not constitute adverse employment actions.

Furthermore, there is no evidence that her course assignments were made in circumstances giving rise to an inference of discrimination. Mills alleges that Andoh gave her less favorable course assignments than he gave male colleagues. However, she offers nothing more than conjecture and conclusory allegations that Andoh gave preferential course assignments to male professors. *See Babcock v. New York State Office of Mental Health*, No. 04 Civ. 2261 (PGG), 2009 WL 1598796, at *4 (S.D.N.Y. June 8, 2009) ("Conclusory statements that 'similarly situated' employees outside the protected class were treated more favorably are not sufficient to defeat summary judgment."). During her deposition, Mills admitted that she does not know what classes were requested and received by her male colleagues. She could only identify one course, Intermediate Economics, that she would have liked to have taught but was not given an opportunity to teach. Mills Depo. at 313-15. This class was generally assigned to a male professor, Dr. Bodo. *Id.* at 100. When asked about her course load from Fall 2005 to Fall 2010, Mills testified that she could not recall any specific course that she requested and was denied. *Id.* at 302, 312. Mills also testified that she was assigned several courses that she enjoyed teaching, including upper level courses, graduate MBA courses, independent study courses, and "LINKS" courses, which are smaller in size than regular classes. *Id.* at 299-302, 305, 308-12. Mills also asserts that she had difficulty getting her classes scheduled around faculty Senate meetings. However, she admitted that in each instance Andoh ultimately changed her schedule so that she could attend the meetings. *Id.* at 316-18.

As Department Chairperson, Andoh was required to balance a number of competing interests when preparing the course schedule. Andoh Decl. [Doc. #58-5] ¶¶ 37-40. He had to balance the preferences of each professor for courses and times with classroom availability and student interests and needs. *Id.* Andoh sought faculty input about their preferences and tried to accommodate each faculty member's preferences to the extent possible. *Id.* The fact that Mills was not permitted to teach one course that she wanted to teach and that Andoh may not have accommodated her preferred schedule in every regard simply does not give rise to an inference that she was subjected to discriminatory treatment on the basis of her gender.

### c. Other Actions

Mills also complains of a number of other actions, including Andoh's lack of promptness in responding to her, other faculty members "shunning" her and "boycotting" events that she hosted, students being discouraged from associating with her outside of class and being warned that they may not get recommendations if they did so, and being labeled a troublemaker outside the Department, which she claims negatively influenced her ability to serve on University committees or engage in other career-enhancing activities. However, she presents no evidence that any of these actions rose to the level of a "materially adverse change in the terms and conditions of employment." *Galabya*, 202 F.3d at 640.

Moreover, Mills' assertion that these actions were taken on the basis of her gender is entirely speculative and does not support an inference of

discrimination on the part of anyone at SCSU.  Indeed, in many instances the testimony she cites fails to demonstrate that these actions even occurred at all.  For example, Mills claims that students were discouraged from attending events she hosted and told that if they associated with her, certain male faculty would not give them recommendations.  She claims that Andoh made these statements to students.  However, she testified that she is not aware of a single student who was denied a recommendation by Andoh or Gebremariam.  Mills Depo. at 345-46.  Similarly, Mills claims that she was labeled a "troublemaker" and that faculty members inside her Department negatively influenced people outside the Department against her.  However, when asked to recount specific instances, Mills could only describe one brief hearsay conversation between Gebremariam and Dr. Onley of the Political Science Department in 2009, which she described as a "run-in" between the two men, during which Gebremariam allegedly said that "he was sort of hoping that we had gone away."  Mills Depo. at 146-47.  Apart from this single incident, Mills surmised that people outside the Department had been negatively influenced based upon the "reaction" that she received when she spoke during committee meetings, such as when people looked at her with "surprise" if she made a good point that contributed to the discussion.  *Id.*  This type of conjecture is insufficient to create a genuine issue of material fact for trial.  Mills further claims that, as a result of being labeled a "troublemaker," she had difficulty serving on University committees or participating in other career-enhancing activities.  However, she offers no concrete evidence to support this claim.  To the contrary, Mills testified that since 2006 she has served on

numerous University committees and was elected to the faculty Senate from her Department. *Id.* at 198-99.

In sum, the only evidence that Mills cites in support of her discrimination claim is her own deposition testimony, which is replete with conclusory and self-serving accusations that cannot create a genuine issue of material fact for trial. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."); *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2010) ("[A] jury cannot infer discrimination from thin air.").

### 2. Hostile Work Environment

Under Title VII, it is unlawful for an employer to subject employees to a discriminatorily hostile or abusive work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); 42 U.S.C. § 2000e-2(a)(1). To prove that a workplace is actionably "hostile" under Title VII, a plaintiff must demonstrate that: (1) she "subjectively perceive[d] the environment to be abusive;" (2) the conduct was so "severe or pervasive" that it created an "objectively hostile or abusive work environment", meaning "an environment that a reasonable person would find hostile or abusive;" and (3) the conduct created an environment abusive to employees "because of their race, gender, religion or national origin." *Harris*, 510 U.S. at 21-22.

The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile

as to support a Title VII claim.  These include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; . . . whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" *Id.* at 23.

To determine "whether an environment may be considered sufficiently hostile or abusive to support [a Title VII claim]," courts must consider "the totality of the circumstances." *Williams v. Westchester,* 171 F.3d 98, 100 (2d Cir.1999) (citing *Harris,* 510 U.S. at 23).  The factors outlined above must be evaluated "cumulatively" so that the Court can "obtain a realistic view of the work environment."  *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) (citations omitted).  This includes evaluating the "quantity, frequency, and severity" of the discriminatory incidents.  *Id.*  "In order to meet [her] burden, the plaintiff must show more than a few isolated incidents of [gender-based] enmity[.]"  *Williams*, 171 F.3d at 100.  Instead, the plaintiff "must establish that [her] workplace was permeated with instances of [sexually] discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'"  *Id.* (citations omitted).

Furthermore, the alleged hostility must be generated on the basis of a protected characteristic.  As the Second Circuit has noted, federal law "does not guarantee a utopian workplace, or even a pleasant one.  Indeed, Title VII is not a

civility code." *McGallum v. Cedar Graphic, Inc.*, 609 F.3d 70 (2d Cir. 2010). Personality conflicts between employees are not the business of the federal courts. *Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994). The fact that a supervisor is rude, disrespectful, yells at or criticizes an employee will not support a hostile work environment claim in the absence of any connection to a protected characteristic. *See Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999).

Much of the evidence that Mills cites in support of her hostile work environment claim is the same as that used to support her discrimination claim. Mills alleges that Gebremariam inappropriately hugged her in October 2004. She claims that Gebremariam made a comment about her working with small children that she interpreted to suggest that she was not following appropriate gender roles. She further alleges that Gebremariam spoke in general terms about unprofessional accusations against him and his wife during a faculty meeting in October 2005, which Mills construed as a verbal attack on her. She contends that Andoh "supported" Gebremariam's harassment of her by failing to respond properly to her complaint about the hug incident, even though Andoh instructed Gebremariam to apologize to her and later referred the matter to OCE for an investigation. She also alleges that Andoh engaged in threatening behavior toward her during two meetings, in one case dropping his books and slapping the desk and in another instance slamming his office door.

In addition, Mills asserts that another male faculty member, Abugri, harassed her because he "looms," which she described as "getting in her face,

maybe a foot away," or "leaning over the table" toward her when he disagreed with her at faculty meetings.  Mills Depo. at 26-29.  She further claims that Abugri sent emails to her discussing the selection of a new chairperson which were "threatening in tone," including an email in which Abugri noted that a committee on which Mills had been a member had been recalled and expressed his view that if a new procedure was being implemented regarding the chair selection process all faculty members needed to be informed and had the right to a hearing on the matter.  Mills Depo. at 37-38.  Contrary to Mills' assertion, however, there is nothing in the emails that could reasonably be construed as a threat.  Instead, Abugri appears to have been merely expressing his disagreement with Mills.

Finally, Mills claims that Andoh, Gebremariam, Abugri, and other male faculty members created a hostile work environment by "shunning" her and excluding her from discussions between faculty members.

The Court holds that the evidence submitted by Mills is insufficient as a matter of law to demonstrate that the workplace was permeated with instances of "severe or pervasive" discriminatory conduct based upon her gender.  "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.'"  *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted).  Thus, Mills must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Id.*  Mills does neither.  Gebremariam's hug, which apparently was in gratitude for Mills' assistance on a project and

which could be construed as non-sexual, clearly was not severe enough to give rise to a hostile work environment claim. *See, e.g., Tabachnik v. Jewish Theological Seminary of America*, No. 03 Civ. 2759(HB), 2004 WL 414826, at *3 (S.D.N.Y. Mar. 4, 2004) ("Merely hugging a subordinate in an effort to console, touching a subordinate's thigh during a meeting when such conduct could be construed as non-sexual in nature, and stating one's love for a subordinate in a telephone message, do not collectively establish a hostile work environment."); *Feliciano v. Alpha Sector*, No. 00 CIV. 9309(AGS), 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (rejecting hostile work environment claim where supervisor complimented plaintiff, attempted to hug her, stated on one occasion that he wanted to "lay with" her, and kissed her).

The remaining incidents cited by Mills, including Gebremariam's statement during the faculty meeting, Gebremariam's comment about Mills working with small children, Andoh's response to her complaint about the hug by Gebremariam, Andoh's expressions of frustration during meetings with her, and Abugri's emails and his "looming" over her when he disagreed with her, were either entirely appropriate or fairly innocuous behaviors that do not give rise to a hostile work environment claim. Mills seems to have interpreted any expression of disagreement with her as harassment. However, Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 235 U.S. 75, 80 (1998). Participating in a workplace, particularly an academic environment like SCSU, necessitates debate and disagreement that may become vigorous at times. Nothing in Mills' deposition testimony suggests that anyone at

SCSU crossed the boundaries of permissible debate and subjected her to "discriminatory intimidation, ridicule, and insult." *Williams*, 171 F.3d at 100. Nor does the fact that Mills' male colleagues shunned her or avoided her at work constitute an actionable offense under Title VII. *See Quarles v. Bronx Lebanon Hosp.* Center, 75 Fed. Appx. 846, 848 (2d Cir. 2003) (allegations that plaintiff was "shunned, kept away from meetings he usually attended, and his authority was undermined" did not give rise to a hostile work environment claim). As another district court has observed, "[s]tepping out of one's home into the working world means, to some extent, subjecting oneself to the slings and arrows of daily life. Title VII does not codify Emily Post's rules of etiquette." *Feliciano*, 2002 WL 1492139, at *8. Furthermore, there is no evidence that any of the foregoing conduct was based upon Mills' gender. Therefore, Mills cannot establish a hostile work environment claim.

### 3. Retaliation

The anti-retaliation provision of Title VII prohibits an employer from discriminating against an employee because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework employed for claims of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must make four showings: (1) that she was engaged in "protected activity"; (2) that her

employer was aware of that activity; (3) that she suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Manoharan v. Columbia Univ. Coll. of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).  As with discrimination claims, if the plaintiff makes the prima facie showing, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse action.  *Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 600 (E.D.N.Y. 2007).  If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons are simply a pretext for retaliation.  *Id.*

The Defendants do not dispute that Mills engaged in protected activity by complaining of alleged employment discrimination.  *See Hubbard v. Total Comm., Inc.*, 347 Fed. Appx. 679, 680-81 (2d Cir. 2009) ("'Protected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or hearing under Title VII."); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 437 (E.D.N.Y. 2009) (noting that even "informal complaints to supervisors constitute protected activity under Title VII").  There is also no dispute that SCSU was aware of Mills' complaints, since they were reported to the ODE and the ODE conducted investigations into her allegations.  Therefore, the Court must consider whether Mills suffered an adverse employment action and, if so, whether there was a causal connection between the protected activity and the adverse employment action.

Unlike in the context of a disparate treatment claim, a materially adverse action for purposes of a retaliation claim need not affect the plaintiff's terms and

conditions of employment. *Cunningham v. New York State Dept. of Labor*, 326 Fex. Appx. 617, 620-21 (2d Cir. 2009). In the retaliation context, the Supreme Court has adopted an objective standard based upon a hypothetical reasonable employee. *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (internal quotation marks omitted). Under that standard, "[w]hether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (citation and internal quotation marks omitted). Nevertheless, "petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *White*, 548 U.S. at 68).

In order to demonstrate a causal connection between the protected activity and the adverse employment action, the plaintiff must show "that a retaliatory motive played a part in the adverse employment action." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

### a. Failure to Promote

Mills' failure to be promoted qualifies as an adverse employment action. However, she has failed to present sufficient evidence to show a causal connection between her complaints of discrimination and her failure to be promoted. Gebremariam, the person who Mills formally accused of harassing her, resigned from the DEC when she applied for promotion in 2005, as did the other two members of the DEC. As a result, Mills was evaluated the following

year by a new DEC and promised retroactive effect of any resulting promotion. That DEC recommended her for promotion, as did the Dean of the Business School.  Andoh, who Mills also accuses of discriminating against her, played no role in the evaluation process.  The P&T Committee decided not to recommend Mills for promotion.  Gebremariam, who was on the P&T Committee in 2006, recused himself from reviewing Mills' application.  Ultimately, the President decided not to promote Mills.  Although Mills speculates that Andoh and Gebremariam influenced the P&T Committee against her, she offers no evidence whatsoever to support this allegation.

Nor does Mills provide circumstantial evidence of retaliatory animus, such as, for example, evidence of disparate treatment of employees who engaged in similar conduct or a showing that her complaints of discrimination were followed closely in time by the adverse action.  *See Sumner v. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990); *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  Mills made her complaint regarding the hug incident in late 2004, and claims that Gebremariam verbally attacked her in October 2005.  The P&T Committee made its decision not to recommend Mills for promotion on March 2, 2007, and the President denied Mills' application for promotion on April 13, 2007, nearly two-and-a-half years after her complaint about the hug and a-year-and-a-half after her complaint about Gebremariam's statements during the faculty meeting.  The passage of time between Mills' complaints and SCSU's decision not to promote her defeats any retaliatory nexus in the circumstances of this case.  *See, e.g., Cunningham v. Consolidated Edison Inc.*, No. CV-03-3522(CPS),

2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (holding that a passage of two months between protected activity and adverse employment action attenuated causal relationship); *Hussein v. Hotel Employees & Restaurant Union, Local 6*, 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich American Ins. Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (finding that two-and-a-half months is "hardly the close proximity of time contemplated . . . for allowing a plaintiff to establish the 'causal connection' element of [a] retaliation claim"). Thus, there is no evidence, either direct or circumstantial, that the P&T Committee or the President harbored any retaliatory motive against Mills.

### b. Other Actions

None of the other actions that Mills complains of constitute adverse employment actions, even under the more lenient standard applicable to retaliation claims. Mills' complaint about receiving an unfavorable work schedule is simply not supported by her deposition testimony. She identified only one class that she wanted to teach but was not given an opportunity to teach. She also claimed that it was difficult to get her classes scheduled around Senate faculty meetings, but admitted that Andoh ultimately changed her schedule so that she could attend the meetings. She also admitted that she taught several classes she enjoyed. She was unaware of what courses other professors requested. Thus, there is no basis to conclude that Andoh retaliated against her by assigning her an unfavorable work schedule. In creating a course schedule for the Department, Andoh had to attempt to balance the preferences of several

professors with a number of other competing concerns.  Mills cannot reasonably expect her every request to be accommodated one hundred percent of the time.

Mills' other allegations of retaliatory action are similarly unsupported by her deposition testimony.  For instance, she claims that students were discouraged from attending events she hosted and threatened that they would not receive recommendation letters if they associated with her.  However, she was unable to provide any specifics and did not identify a single student who was denied a recommendation by Andoh or Gebremariam.  She claims that she was labeled a troublemaker outside the Department and as a result had difficulty serving on University committees.  However, she has presented no evidence to substantiate this claim.  On the contrary, she admits that, since 2006, she has served on several committees and was elected to the faculty Senate from her Department.  She claims that Andoh was slower in responding to her than he was to other faculty members.  Even if true, there is no evidence that any delay by Andoh in responding to her amounted to anything more than a "petty slight or minor annoyance" that cannot give rise to an actionable retaliation claim.  *Hicks*, 593 F.3d at 165.

Finally, Mills claims that Andoh, Gebremariam, Abugri and other male faculty members shunned her after she complained of harassment and discrimination.  In the circumstances of this case, the Court does not believe that the shunning and ostracism that Mills claims to have experienced amounts to an adverse employment action.  Given Mills' repeated claims of discrimination and harassment that appear to have been unfounded, the efforts taken by

Gebremariam, Andoh and others to avoid her unless necessary out of fear that they would be subjected to further accusations was understandable. Moreover, the Court does not believe that a reasonable person would be dissuaded from making a charge of discrimination as a result of the shunning that Mills alleges took place in this case, particularly in light of Mills' admission that she was an active participant in University committees and the faculty Senate. There is no evidence that Mills was excluded from any activities that contributed significantly to her professional development or prevented her from advancing her career. *See, e.g.*, *Mabry v. Neighborhood Defender Service*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) (holding that plaintiff's allegation that he was excluded from management meetings did not rise to the level of a material adverse action); *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007) (holding that plaintiff's allegations that she was kept out of the departmental information "loop" was not sufficient to constitute retaliation); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 969 (8th Cir. 1999) (holding that ostracism and disrespect by supervisors did not rise to the level of an adverse employment action). To hold otherwise would transform Title VII into a "general civility code" for the workplace. *Oncale*, 235 at 80.

## B. CFEPA Claim Against Andoh and Gebremariam (Counts Two and Three)

In Counts Two and Three, respectively, Mills alleges that Andoh and Gebremariam's conduct violated Section 46a-60 of the CFEPA. Mills does not specify which subsections of the CFEPA apply to this claim. Section 46(a)(1) addresses discrimination based upon a protected classification. However, there

is no personal liability under this subsection.  *See Perodeau v. City of Hartford*, 259 Conn. 729, 737 (2002) (holding that "[Section] 46a-60(a)(1) does not impose liability on individual employees").  Section 46(a)(5) refers to aiding and abetting.  Although Mills summarily argues in her memorandum in opposition that Andoh and Gebremariam aided and abetted discrimination against her, there are no facts pleaded in the complaint and no evidence which would support a claim for aiding and abetting.  Therefore, the only viable claims that Mills alleges is a claim for retaliation under Section 46a-60(a)(4), which can support personal liability.  *See Perodeau*, 259 Conn. at 738.

It is well-established that CFEPA claims proceed under the same analysis as federal Title VII claims.  *See Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."); *Brittell v. Department of Correction*, 247 Conn. 148, 164 (1998); *State v. Commission on Human Rights and Opportunities*, 211 Conn. 464, 470-71 (1989).  The Court has held that Mills has presented insufficient evidence to survive summary judgment on her Title VII retaliation claim.  Since the same analysis applies to her CFEPA claims against Andoh and Gebremariam, the Defendants' motion for summary judgment is granted with respect to these claims as well.

### C. Equal Protection Claim Against Andoh and Gebremariam (Counts Six and Seven)

In Counts Six and Seven, respectively, Mills alleges that the actions of Andoh and Gebremariam violated the Equal Protection clause as enforced by 42 U.S.C. § 1983.  The analytical framework of a workplace equal protection claim

parallels that of a discrimination claim under Title VII. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause."), *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) ("[W]hen § 1983 is used as a parallel remedy with Title VII in a discrimination suit . . . the elements of the substantive cause of action are the same under both statutes."). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006).

Mills' equal protection claims fail as a matter of law for all of the reasons discussed in the Court's analysis of her Title VII claim. Mills has failed to submit evidence sufficient to establish a prima facie case of gender-based discrimination or retaliation or to demonstrate "severe or pervasive" harassment necessary to support a hostile work environment claim. Moreover, Andoh and Gebremariam are entitled to qualified immunity because Mills has not shown that they violated a clearly established constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (government officials performing a discretionary function are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### D. Intentional Infliction of Emotional Distress Claims
### Against Andoh and Gebremariam (Counts Four and Five)

In Counts Four and Five, Mills asserts intentional infliction of emotional distress claims against Andoh and Gebremariam, respectively.  In order to prevail on a claim for intentional infliction of emotional distress under Connecticut law, a plaintiff must establish the following four elements:  "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253 (2006).

The question of whether a defendant's behavior was extreme and outrageous is initially a question for the Court to decide and only in cases where reasonable minds may disagree does it become a question for the jury. *Bombalicki v. Pastore*, 71 Conn. App. 835, 840 (2002).  Courts have set a high standard for what qualifies as extreme and outrageous.  Conduct that is "merely insulting or displays bad manners or results in hurt feelings" is not sufficient to establish a claim for intentional infliction of emotional distress.  *Id*.  The conduct has to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*

"In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous.  An employer's adverse yet routine employment action does not constitute extreme and outrageous

conduct even if based on race or other improper motives." *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008) (internal citation and quotation marks omitted). "Routine employment action, even if undertaken with improper motivations, does not constitute extreme or outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." *Conge v. Sikorsky Aircraft Corp.*, No.3:075-cv-1650, 2007 WL 4365676, at *10 (D. Conn. Dec. 11, 2007).

In this case, none of the conduct that Andoh and Gebremariam allegedly engaged in rises to the level necessary to support an intentional infliction of emotional distress claim. No reasonable juror could conclude that Gebremariam's hug was "extreme and outrageous." Nor could a reasonable juror conclude that Gebremariam's statements during the faculty meeting or his reference to Mills' work with young children qualify as "extreme and outrageous" behavior.

Similarly, none of the conduct that Andoh is alleged to have engaged in qualifies as "extreme and outrageous." Mills claims that Andoh "supported" Gebremariam's harassment of her by not properly responding to the hug incident. However, the record reveals that Andoh took appropriate steps to address the incident. Mills' dissatisfaction with the outcome of the ODE's investigation into the hug incident does not give rise to a claim for intentional infliction of emotional distress. Likewise, Mills cannot assert such a claim based upon her unhappiness with the course schedule that Andoh assigned to her.

The other actions that Andoh allegedly engaged in, including slapping his desk in anger during a meeting with Mills, slamming his door after another meeting, and failing to respond promptly to her, may have frightened or insulted her or hurt her feelings, but they were not sufficiently egregious to support an intentional infliction of emotional distress claim. *See, e.g., Bator v. Yale-New Haven Hospital*, 73 Conn. App. 576, 577-78 (2002) (holding that plaintiff could not sustain a claim for intentional infliction of emotional distress where his employer ordered him to report to work while under a physician's care, falsely accused him of endangering a patient's life, and subjected him to disparate treatment); *Carroll v. Allstate Insurance Co.*, 262 Conn. 433, 443-44 (2003) (holding that there was insufficient evidence to support a claim for intentional infliction of emotional distress where defendant, a fire inspector, harassed the plaintiff, whose house had burned down, by repeatedly questioning him, making racially charged comments, and conducting a shoddy investigation resulting in a determination that the plaintiff set the fire deliberately); *DeLeon v. Little*, 981 F. Supp. 728, 738 n.8 (D. Conn. 1997) (holding that defendant's actions did not rise to the level of extreme and outrageous behavior where defendant's conduct included "[giving] orders to purchase illegal drugs, orders to stand guard while [d]efendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to plaintiff at her home, [making] threats to terminate plaintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating

criticism of [p]laintiff in the presence of others."). The fact that Andoh and Gebremariam may have shunned and avoided Mills does not support her claims against them for the same reason.

Finally, Andoh and Gebremariam cannot be held liable for failing to promote Mills because there is no evidence that they were responsible for the promotion decision. To the contrary, Andoh declined to evaluate Mills, and Gebremariam resigned from the DEC and recused himself from evaluating Mills in his capacity as a member of the P&T Committee. Moreover, even if they were involved in the denial of Mills' promotion, there is no evidence that the denial was anything other than a "routine employment action" and thus did not constitute extreme or outrageous behavior. *See Bombalicki*, 71 Conn. App. at 841 (holding that evidence was insufficient to support claim for intentional infliction of emotional distress where defendant's actions included "expressing his dislike of the plaintiff, talking about the plaintiff unfavorably to other [employees], opposition to the plaintiff's promotion and an ultimate decision not to recommend the plaintiff for promotion").

*IV. CONCLUSION*

Based upon the foregoing reasoning, the Defendants' motion for summary judgment [Doc. #58] is GRANTED. The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.
_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: August 10, 2011.